# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| FIELDTURF INTERNATIONAL, INC., and FIELDTURF, INC., | ) ) ) ) | Case No. 03C3512 |
| Plaintiffs/Counterclaim-Defendants, | ) ) | |
| v. | ) ) | Hon. Wayne R. Andersen Presiding Judge |
| TRIEXE MANAGEMENT GROUP INC., SPORTEXE CONSTRUCTION SERVICES, INC., SPORTEXE INTERNATIONAL, INC., and SPORTEXE, INC., | ) ) ) ) ) | Hon. Maria Valdez Magistrate Judge |
| Defendants/ Counterclaim-Plaintiffs. | ) ) | |

## SPORTEXE'S CLAIM CONSTRUCTION BRIEF

### [REDACTED VERSION]

PHILLIPS LYTLE LLP
3400 HSBC Center
Buffalo, New York 14203
Tel: (716) 847-8400

BELL, BOYD & LLOYD LLC
Three First National Plaza
70 West Madison Street, Suite 3300
Chicago, Illinois 60602-4207
Tel: (312) 372-1121

Attorneys for Defendants/Counterclaim-Plaintiffs

## Table of Contents

Page

I. PRELIMINARY STATEMENT ......................................................................... 1

II. SUMMARY OF ARGUMENT ....................................................................... 1

    A.    The '689 and '527 Patents................................................................. 1

    B.    The '885 Patent.................................................................................. 3

III. THE LAW OF CLAIM CONSTRUCTION .................................................. 3

    A.    Intrinsic Evidence ............................................................................ 4

        1.    Claim Language ....................................................................... 4

        2.    Patent Specification................................................................. 5

        3.    Prosecution History ................................................................ 7

        4.    Related Patents and Applications ............................................ 9

    B.    Extrinsic Evidence ........................................................................... 9

IV. CONSTRUCTION OF THE '689 PATENT.................................................. 10

    A.    "Disposed" ........................................................................................ 12

        1.    The Specification ..................................................................... 13

        2.    Uniformly Installed Infill Criticized and Distinguished in the Specification .......................................................................... 15

        3.    The Preamble ........................................................................... 18

        4.    Prosecution History ................................................................. 20

        5.    Sportexe's Proposed Construction is Supported by the Case Law .......... 21

        6.    Inventor Testimony ................................................................. 22

        7.    Dictionary Definition .............................................................. 23

        8.    Fieldturf's Proposed Construction is Not Enabled ................. 23

9. Fieldturf's Attempt to Compartmentalize Product Claims and Process Claims Should Be Rejected ................................................................... 24

10. Conclusion ................................................................................ 25

B. "Infill Layer" ........................................................................................ 25

C. "Course" ............................................................................................... 25

D. "Substantially Exclusively" .................................................................. 26

E. Dependent Claim 2 ............................................................................... 28

F. "Cryogenically Ground Rubber" ........................................................... 29

G. "Rows Spaced Apart" ............................................................................ 29

H. Dependent Claim 14 .............................................................................. 29

I. Dependent Claim 18 .............................................................................. 30

V. CONSTRUCTION OF THE '527 PATENT .......................................................... 30

A. "Disposed" ........................................................................................... 32

1. The Specification ....................................................................... 33

2. Prior Art Distinguished and Criticized in the Specification ................... 34

3. Sportexe's Proposed Construction is Supported by the Preamble, the Case Law and the Dictionary Definition ........................................... 35

4. Fieldturf's Proposed Construction is Not Enabled ................................ 35

B. "Infill Layer"; "Course; "Substantially Exclusively" ........................................... 35

C. "Installed Unit Weight" ........................................................................ 36

VI. CONSTRUCTION OF THE '885 PATENT ........................................................... 36

A. Independent Claim 7 and Its Dependent Claim 9 ................................................ 37

1. Claim 7 ...................................................................................... 37

2. Claim 9 ...................................................................................... 37

B.    Independent Claim 10 ......................................................................... 39

      1.    The Specification ................................................................ 40

      2.    Prosecution History ............................................................ 41

      3.    Inventor Testimony ............................................................. 44

      4.    Conclusion ......................................................................... 45

VII. CONCLUSION ........................................................................................ 46

## TABLE OF AUTHORITIES

Page

### CASES

*Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003)... 6, 15, 17

*Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554 (Fed. Cir. 1996)....................... 17, 18

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000).......... 21

*Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573 (Fed. Cir. 1996) ................................................................................................................. 24

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir. 1992).......... 24

*Autogiro Co. of America v. United States*, 384 F.2d 391 (Ct. Cl. 1967)........................ 4, 7

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001)........................................................................................ 7

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 326 F.3d 1215 (Fed. Cir. 2003) ............ 4

*C.R. Bard Inc. v. United States Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004)  6, 9, 15, 16

*CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997) ............................ 44

*Cadwell v. Firestone Tire & Rubber Co.*, 13 F.2d 483 (E.D.N.Y. 1926), *aff'd per curiam*, 23 F.2d 1000 (2d Cir. 1928)......................................................................... 22

*Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110 (Fed. Cir. 1983) ........................ 9

*Chimie v. PPG Industrial, Inc.*, 402 F.3d 1371 (Fed. Cir. 2005).................................. 7, 8

*Corning Glass Works v. Sumitomo Electric USA, Inc.*, 868 F.2d 1251 (Fed. Cir. 1989) ................................................................................................................. 19

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291 (Fed. Cir. 2005) ....................................................................................................... 3

*Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998) .................... 6, 24

*Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000) ....................................................................................................... 8

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973 (Fed. Cir. 1999) ................................................................................................. 8, 9

*Elyria National Rubber Heel Co. v. I.T.S. Rubber Co.*, 263 F. 979 (6th Cir. 1920) ......... 22

*General Electric Co. v. Nintendo Co.*, 179 F.3d 1350 (Fed. Cir. 1999) ................... 19, 20

*Harris Corp. v. IXYS Corp.*, 114 F.3d 1149 (Fed. Cir. 1997) ......................................... 17

*Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.*, 222 F.3d 951 (Fed. Cir. 2000) ...................................................................... 3, 8, 43, 44

*Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369 (Fed. Cir. 1999) .............. 6

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996) ............... 10

*In re Cruciferous Sprout Litigation*, 301 F.3d 1343 (Fed. Cir. 2002) ............................ 19

*In re Fine*, 837 F.2d 1371 (Fed. Cir. 1988) .................................................................... 38

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ............................................................................. 3, 4, 5

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295 (Fed. Cir. 2004) ............... 4

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563 (Fed. Cir. 1997) .............. 4

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990) ...................................... 9, 10, 30

*Liposome Co. v. Vestar Inc.*, 1994 WL 738952 at 14, 36 U.S.P.Q. 2d 1295, 1306 ........... 9

*Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995)(en banc) *aff'd*, 517 U.S. 370 (1996) .............................................................................. 1, 3, 4, 5, 9

*Microsoft Corp. v. Multi-Tech System, Inc.*, 357 F.3d 1340 (Fed. Cir. 2004) ................... 7

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998) ................... 5

*Novartis Pharmaceuticals Corp. v. Eon Laboratoriess Manufacturing, Inc.*, 363 F.3d 1306 (Fed. Cir. 2004) ....................................................................... 21

*O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed. Cir. 1997) ....................... 6, 16, 17, 40, 41

*Omark Industries, Inc. v. Carlton Company*, 458 F. Supp. 449 (D. Or. 1978),
    *aff'd*, 652 F.2d 783 (9th Cir. 1980) ............................................................22

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc) ..............3, 4, 5, 7, 9, 10,
    23

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) ..................19

*Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303 (Fed. Cir.
    2004) ....................................................................................................19

*SciMed Life System, Inc. v. Advanced Cardiovascular System, Inc.*, 242 F.3d
    1337 (Fed. Cir. 2001) ...........................................................................6, 8, 16

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ............ 8, 30, 44

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985)...................8

*Stash, Inc. v. Palmgard International, Inc.*, 937 F. Supp. 531 (D. Md. 1996) .................21

*Tanabe Seiyaku Co., Ltd. v. United States International Trade Commission*, 109
    F.3d 726 (Fed. Cir. 1997) ........................................................................9

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) ............38

*V-Formation Inc. v. Bennetton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ...................8

*Vanderlande Industrial Nederland BV v. International Trade Commission*, 366
    F.3d 1311 (Fed. Cir. 2004) .......................................................................9

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ............4, 5, 7, 8, 10

*Voice Technologies Group, Inc. v. VMC Systems, Inc.*, 164 F.3d 605 (Fed. Cir.
    1999) ...................................................................................................10

*Wang Laboratoriess, Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir.
    1999) ..................................................................................................6, 8

*Watts v. XL System, Inc.*, 232 F.3d 877 (Fed. Cir. 2000) ................................. 6, 7, 14, 15

*White v. Dunbar*, 119 U.S. 47 (1886)..............................................................8

## STATUTES

35 U.S.C. §102(b) .............................................................................20

35 U.S.C. § 112 .................................................................................................... 23, 38

37 C.F.R. § 1.77(b) .................................................................................................... 5

## I. PRELIMINARY STATEMENT

Plaintiffs ("Fieldturf") allege that defendants ("Sportexe") have infringed U.S. Patent

Nos. 6,551,689 ("the '689 patent") and 6,338,885 ("the '885 patent"). Sportexe seeks

declarations of invalidity and non-infringement relative to the '689 and '885 patents, as well as

U.S. Patent No. 5,958,527 ("the '527 patent").

Pursuant to *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995) (en banc),

*aff'd*, 517 U.S. 370 (1996), Sportexe submits this Claim Construction Brief in support of its

proposed construction of disputed claim terms.

## II. SUMMARY OF ARGUMENT

### A. The '689 and '527 Patents

The '689 patent claims artificial turf having a particulate infill of hard granules (such as

sand) and resilient granules (such as rubber) disposed in two distinct layers or "courses", and the

'527 patent claims artificial turf having three distinct layers. Fieldturf asserts that Sportexe has

infringed the '689 patent despite the fact that Sportexe installs a *uniform*, or homogenous, mix of

sand and rubber throughout the depth of the infill, as taught by the prior art, including Fieldturf's

own expired U.S. Patent No. 4,337,283 ("the '283 patent").

In this action, Fieldturf improperly attempts to extend the term of the '283 patent by

proposing a claim construction that would encompass such *uniformly installed* prior art turf.

Because the '689 patent's specification distinguishes and criticizes such prior art at great length,

and describes in detail the "disadvantages result[ing] from the use of a uniformly mixed granular

infill . . . where hard sand particles and resilient rubber particles are mixed and blended in a

uniform proportion throughout the depth of the infill,"[1] Fieldturf's proposed construction is too

broad. The '527 patent's specification likewise distinguishes the use of a uniform mix of sand

and rubber:

> *The significant difference between the method of the invention and*
> *the prior art is the* <u>*depositing*</u> *of multiple separate courses each*
> *with different characteristics.* Of course, depositing multiple
> layers involves more skill and time than depositing a single thick
> layer, however, the advantages are significant...[2]

Because claim terms must be interpreted in a manner consistent with their use in the patent

specification, and may not be construed one way in order to secure a patent and in another way

in an infringement action, the '527 and '689 patents must be construed to *exclude* an infill

installed as a uniform/homogenous mix of sand and rubber, as such an infill is clearly taught in

the prior art and was repeatedly criticized by the patentee in the patents at hand.

     Claim 1 of the '689 patent calls for an infill having two distinct layers: a bottom course

of intermixed hard and resilient granules *disposed upon* a backing, and a top course of resilient

granules *disposed upon* the bottom course. Similarly, claim 1 of the '527 patent calls for an

infill having three distinct layers: a base course substantially exclusively of hard granules

*disposed upon* a backing, a middle course of intermixed hard and resilient granules *disposed*

*upon* the base course, and a top course of resilient granules *disposed upon* the middle course. In

light of the patent specification, the prosecution history, the claim itself, dictionary definitions,

the prior art and the inventor's testimony, the term "disposed upon" in claim 1 of each patent

---

    [1] '689 patent, col. 1, lines 59-63; *see, also,* '527 patent, col. 1, line 59 – col. 2, line 57 ("A number of disadvantages result from the use of a uniformly mixed granular infill as in prior art systems where hard sand particles and resilient rubber particles are mixed in a uniform manner throughout the depth of the infill...").

    [2] '527 patent, col. 5, lines 62-67 (emphasis added); *see, also,* Berchou Aff. Ex. C, p. 9 (Prevost Canadian Patent Application No. 2,247,484) ("Of course, depositing multiple layers involves more skill and time than depositing a single thick layer, however, the advantages are significant...").

should be construed to mean installed or put in place at the time of installation, and the claimed "courses" should be interpreted as continuous, distinct, separate and uniform layers.

## B.   The '885 Patent

Claim 7 of the '885 patent relates to the use of "cryogenically ground rubber" in infilled artificial turf. In accordance with the patent specification and statements in the prosecution history, this claim should be construed to *exclude* ambiently ground rubber.

Claim 10 calls for an infill with a mixture of "smooth, resilient particles" and "hard particles". "Smooth" is not defined in the patent's specification, and the named inventor is unable to construe it. The prosecution history, however, requires that the phrase "smooth, resilient particles" be construed to mean particles smoother than ambiently ground rubber particles.

## III.   THE LAW OF CLAIM CONSTRUCTION

A patent consists of three distinct parts: the drawings, the written specification and the claims. The claims are the numbered paragraphs at the end of the patent. "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc), quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim construction is a question of law for the Court to decide. *Markman*, 52 F.3d at 978.

A principal function of the claims is to provide notice to the public as to what will infringe and what will not. *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302-3 (Fed. Cir. 2005); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

### A.    Intrinsic Evidence

The meaning of a claim term must be determined by a study of the intrinsic evidence: the language of the claim itself, the written specification and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman*, 52 F.3d at 979; *Autogiro Co. of America v. United States*, 384 F.2d 391 (Ct. Cl. 1967).

### 1.   Claim Language

Claim construction analysis begins with the language of the claim. *Innova/Pure Water*, 381 F.3d at 1116; *Vitronics*, 90 F.3d at 1582. The words of a claim "are generally given their ordinary and customary meaning" unless the specification or prosecution history indicates that the patentee intended the words to have a special or more constrained meaning. *Phillips*, 415 F.3d at 1312; *Vitronics*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention..." *Phillips*, 415 F.3d at 1313; *Innova*, 381 F.3d at 1116.

"While certain terms may be at the center of the claimed construction debate, the context of the surrounding words of the claim must also be considered in determining the ordinary and customary meaning of those terms." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 326 F.3d 1215, 1220 (Fed. Cir. 2003).

"[I]f a disputed term has 'no previous meaning to those of ordinary skill in the prior art, its meaning, then, must be found elsewhere in the patent.'" *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004), quoting *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1570 (Fed. Cir. 1997). In other words, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

specification." *Phillips*, 415 F.3d at 1313; *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed. Cir. 1998).

2. Patent Specification

A patent's specification includes sections typically entitled Background of the Invention, Disclosure (or Summary) of the Invention, Detailed Description of Preferred Embodiments and Abstract. *See*, 37 CFR § 1.77(b).

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314, quoting *Innova,* 381 F.3d at 1116. "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

Claims "must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

Claims may be interpreted narrowly when the specification indicates the inventor intended to do so. For example,

> Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (limiting claims due to, *inter alia*, discussion in specification of the disadvantages of the prior art); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882-3 (Fed. Cir. 2000) (limiting invention to sole structure described in specification); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382 (Fed. Cir. 1999) (limiting claims to the "only system that is described and enabled" in the patent specification). Similarly,

> [The Federal Circuit] looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment.

*Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361, 1370 (Fed. Cir. 2003).

> [W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

*Id.*, citing *SciMed Life*, 242 F.3d at 1345; *see, also, Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369 (Fed. Cir. 1999); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1580-2 (Fed. Cir. 1997) (because the specification "expressly distinguishe[d] over prior art," the claims were construed so as to not encompass such prior art).

For example, statements in the specification that describe the "invention as a whole," rather than only preferred embodiments, serve to limit the definition of a claim term. *C.R. Bard Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004), citing *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) (relying on "global comments made to distinguish the applicants' 'claimed invention' from the prior art"). "Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." *C.R. Bard*, 388 F.3d at 864, citing

- 6 -

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) ("Those statements, some of which are found in the 'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents.")

The specification may act as a dictionary when it expressly defines terms used in the claims. *Vitronics*, 90 F.3d at 1582. The Federal Circuit has also instructed that the specification may define claim terms "by implication" as a result of a term's consistent use throughout the specification. *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001), quoting *Vitronics*, 90 F.3d at 1582, 1584 n. 6. In other words, "a claim term may be clearly redefined without an explicit statement of redefinition." *Id.* (limiting "modes" to the three modes described in the preferred embodiments).

       3.  <u>Prosecution History</u>

"The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317, citing *Autogiro,* 384 F.2d at 399. The prosecution history includes "any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *Vitronics,* 90 F.3d at 1582-83; *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005); *Bell Atlantic*, 262 F.3d at 1276-77; *Watts,* 232 F.3d at 882-3;

*Wang Labs,* 197 F.3d at 1383-84 (limiting the term "frames" to character-based frames based on statements in prosecution history distinguishing prior art).

A claim may be limited by amendments or arguments of counsel made during prosecution; both are given the same weight in construing claim language. *See, Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973 (Fed. Cir. 1999). All express representations made by or on behalf of the applicant to the examiner to induce a patent grant limit the interpretation of claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed. Cir. 1985); *Chimie,* 402 F.3d at 1384. For example, claims narrowed during prosecution to distinguish over prior art cannot be interpreted to encompass the prior art. *SciMed Life Sys.,* 242 F.3d at 1343; *Hockerson-Halberstadt,* 222 F.3d at 956; *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1308 (Fed. Cir. 2000).[3]

Like the patent specification, "the prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt,* 222 F.3d at 957.

The salient principle here is that a claim is to be construed the same way in an infringement proceeding as it was during prosecution. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995). As one case states, a claim is not a "nose of wax" that may be twisted one way during prosecution and another way in an infringement proceeding. *White v. Dunbar,* 119 U.S. 47, 51-52 (1886).

---

[3] Prior art cited in the specification or prosecution history is intrinsic evidence. *V-Formation Inc. v. Bennetton Group SpA,* 401 F.3d 1307, 1311 (Fed. Cir. 2005); *Vitronics,* 90 F.3d at 1583.

4.  Related Patents and Applications

Representations by or on behalf of the applicant during prosecution of related foreign applications may also be relied upon to construe the same claim terms. *Tanabe Seiyaku Co., Ltd. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 733 (Fed. Cir. 1997); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983); *Liposome Co. v. Vestar Inc.*, 1994 WL 738952 at *14, 36 U.S.P.Q.2d 1295, 1306 (D. Del. Dec. 20, 1994) (foreign patent prosecution statements "are relevant as evidence of how [patentee] had in fact read the words of a claim at a time when it was not looking at them as a necessary step in building a claim for relief that moves from complaint to recovery. . . [and] are also relevant as they are some evidence of how one skilled in the art would read the words in the patent.").

Likewise, the specification and prosecution history of parent, continuation or continuation-in-part applications may be relied upon to interpret the same claim term in a patent. *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990); *Elkay Mfg. Co.*, 192 F.3d at 980.

**B.    Extrinsic Evidence**

The Court may also look to extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317, quoting *Markman*, 52 F.3d at 980. However, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.*, quoting *C.R. Bard*, 388 F.3d at 862, quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004).

It is appropriate for courts to consult dictionary definitions and technical treatises "in order to better understand the underlying technology and [courts] may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict

- 9 -

any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23, quoting *Vitronics*, 90 F.3d at 1584 n. 6.

The testimony of the inventor is relevant to the understanding of the technology at issue and the usage of disputed terms. *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1580 (Fed. Cir. 1996). An inventor may not "by later testimony, change the invention and the claims from their meaning at the time the patent was drafted and granted." *Voice Technologies Group, Inc. v. VMC Systems, Inc.*, 164 F.3d 605, 606 (Fed. Cir. 1999) (holding that district court erred by excluding a deposition and video demonstration by an inventor named in the patent). However, an inventor's statements or testimony may be used against the patent owner by an accused infringer to either narrow a patent claim or to show non-infringement. *Jonsson*, 903 F.2d at 821 (reliance on the inventor's deposition testimony as to the meaning of a claim term was not error).

## IV.  CONSTRUCTION OF THE '689 PATENT

Figure 1 of the '689 patent, reproduced below, discloses a turf system having upstanding synthetic ribbons (2) extending upwardly from a backing (1).[4] Installed amongst the ribbons is an "infill layer" (3) of "particulate material."[5] The infill layer itself is made up of two layers:  a bottom course (5) and a top course (6).[6] The bottom course (5) is a mixture of hard sand granules and resilient rubber granules.[7] The top course (6) is "substantially exclusively of resilient rubber granules."[8]  A "course" is described as a layer.[9]

---

[4]  '689 patent, col. 5, lines 7-10.
[5]  *Id.*, col. 5, lines 10-11.
[6]  *Id.*, col. 9, lines 57-58.
[7]  *Id.*, lines 58-59.
[8]  *Id.*, col. 10, lines 18-19.

- 10 -



FIG.1

As shown below, claim 1 of the '689 patent, the only independent claim, calls for a synthetic surface having an infill with two distinct layers or "courses": a top course substantially exclusively of resilient granules disposed upon a bottom course of intermixed hard and resilient granules.

> 1. A synthetic grass assembly **for installation** on a supporting substrate, the assembly comprising:
>
> a pile fabric with a flexible sheet backing and a plurality of upstanding synthetic ribbons of a selected length, the ribbons extending upwardly from an upper surface of the backing;
>
> an **infill layer** of particulate material **disposed interstitially** between the upstanding ribbons **upon** the upper surface of the backing and of a depth less then the length of the ribbons, the particulate material selected from the group consisting of hard and resilient granules; said infill layer further including
>
> a **bottom course** of intermixed hard and resilient granules, **disposed upon** the upper surface of the backing, and
>
> a **top course substantially exclusively of resilient granules disposed upon** the bottom course, an upper portion of the synthetic ribbons extending upwardly from a top surface of the top course . . .

---

[2] *See, e.g.*, '689 patent, col. 10, line 18 (referring to the "top course **6**"), and col. 11, line 63 (referring to the "top layer **6**").

A.    **"Disposed"**

Of critical importance is the construction of the term "disposed" as used throughout

claim 1. "Disposed" is recited in three separate clauses in claim 1:

| **Claim Terms** | **Fieldturf's Proposed Construction** | **Sportexe's Proposed Construction** |
|---|---|---|
| Claim 1: "particulate material **disposed** interstitially between the upstanding ribbons **upon** the upper surface" | Located between the upstanding ribbons and upon the upper surface of the backing. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses.<br><br>"Upon" should be construed to mean above. |
| Claim 1: "a bottom course . . . **disposed upon** the upper surface of the backing" | Located upon the upper surface of the backing. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses.<br><br>"Upon" should be construed to mean above. |
| Claim 1: "a top course . . . **disposed upon** the bottom course" | Located upon the bottom course. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses.<br><br>"Upon" should be construed to mean above. |

Sportexe submits that the term "disposed" should be construed to mean installed or put in

place. Claim 1 should *not* be construed to encompass an infill in which the rubber and sand is

installed as a uniform mixture, but migrates over time into layers due to the natural effects of

- 12 -

water, vibration and impact, as in the prior art. Sportexe's proposed construction is consistent

not only with the scope of the prior art, but with the definition implied in the specification, the

dictionary definition, the testimony of the inventor and relevant case law.

This issue is particularly significant because Sportexe installs rubber and sand in a

uniform or homogenous mix, as taught by the prior art. Fieldturf has previously argued that such

a field could still infringe because a competitor might "controllably create a layer system for

putting the homogenous application down" by "playing games with particle sizes."[10] In fact,

Fieldturf apparently contends that any Sportexe field, all of which are installed with a uniformly

mixed infill, could at some point later in time infringe claim 1 if the infill migrates. This

contention would require that the term "disposed" be construed to mean something other than

installed or put in place.

As with each term in dispute, however, Fieldturf merely states that disposed is "entitled

to [its] ordinary and customary meaning."[11] In this regard, Fieldturf offers no analysis of the

surrounding words of the claims, no analysis of the specification, no dictionary definition, and

no evidence whatsoever of what one skilled in the art would understand the term "disposed" to

mean. More importantly, Fieldturf ignores the repeated references in the specification, discussed

below, which support Sportexe's proposed construction that "disposed" means "installed or put

in place" and can not encompass a field installed with a uniformly mixed infill that migrates

after installation into courses.

### 1. The Specification

The written specification does not explicitly define "disposed." However, the

specification repeatedly refers to the characteristics of the infill *at the time of installation* as

---

[10] Berchou Aff. Ex. E, p. 58 [Sprinturf v. Fieldturf Markman Hearing Transcript].

[11] Fieldturf's Opening Claim Construction Brief, pp. 8-12.

being critical to the invention. For example, the first column states that "[t]he optimal choice of particle sizes, particle shape, particle composition and *installation in multiple layers or courses is a feature of the present invention*.[12]   Also in the first column, the specification states: "[o]f particular interest to *the present invention* are the various formulations for granular resilient fill that *are placed* between the upstanding ribbons on the upper surface of the backing to simulate the presence of soil."[13] Similarly, the specification explains: "[a]fter the mixed lower infill layer is laid a substantially pure rubber particulate material *is placed* as a resilient top layer."[14] Later, the specification again confirms that "the invention" requires installation in multiple layers:

> With reference to FIG. 1, *the invention* relates to a synthetic grass assembly consisting of a pile fabric with an infill layer of particulate matter which is *installed* on a supporting soil substrate to provide a game playing surface.[15]

Thus, not only are "disposed" and "installed" used interchangeably in the specification, but the specification explicitly states at numerous points that a feature of *the invention*, not just a preferred embodiment, is "*installation* in multiple layers."

In *Watts*, the Federal Circuit focused on similar statements in the specification and limited the term "sealingly connected" to structures utilizing misaligned taper angles. One of the reasons given by the Court was that "the specification actually limits the invention to structures that utilize misaligned taper angles, stating that '*[t]he present invention utilizes [the varying taper angle] feature.*'" *Watts*, 232 F.3d at 883 (emphasis added). The Court found that

---

[12] '689 patent, col. 1, lines 42-44 (emphasis added).
[13] *Id.*, col. 1, lines 35-38 (emphasis added).
[14] *Id.*, col. 10, lines 32-34 (emphasis added).
[15] *Id.*, col. 9, lines 33-36.

arguments to the contrary could not overcome the fact that the subject patent specified "that *the invention* uses misaligned taper angles." *Id.* (emphasis added).

Similarly, in *Alloc*, the parties disputed whether the asserted claims required "play" between panels in a flooring system despite the fact that "none of the asserted patent claims recites the term play." *Alloc*, 342 F.3d at 1368. The Federal Circuit concluded that the specifications of the subject patents read as a whole led to the "inescapable conclusion that the claimed invention must include play in every embodiment." *Id.* at 1370. The Court based its decision largely upon the fact that the subject patents referred to "the invention" as requiring "play."

Likewise, in *C.R. Bard*, the Court construed the term "plug" as limited to a plug with "pleats" although the claim at issue did not make reference to the term pleats. *C.R. Bard*, 388 F.3d at 869. The Federal Circuit relied principally upon the fact that, "[i]n two places, the patent describes in general terms what it deems to be the invention. In both places, the patent unequivocally defines the claimed plug as having pleats." *Id.* at 864.

As in *C.R. Bard*, "[s]tatements of general applicability" in the '689 patent clearly define "dispose" as requiring the placement of multiple distinct layers at the time of installation. 388 F.3d at 866. Furthermore, "statements describing preferred embodiments" of the infill of the '689 patent "universally describe" the depositing or installation of infill in multiple distinct layers. *Id.*

### 2. Uniformly Installed Infill Criticized and Distinguished in the Specification

Fieldturf may not criticize uniformly installed infill in order to obtain a patent and then later argue that the patent covers uniformly installed infill.

- 15 -

In this regard, the specification states that "[a] number of disadvantages result from the use of a uniformly mixed granular infill *as in the Haas ['283 patent] system* where hard sand particles and resilient rubber particles are mixed in a uniform manner throughout the depth of the infill."[16] In the section entitled "Disclosure of the Invention" (not a preferred embodiment),[17] the specification states that:

> The two layer installation with rubber only in the top layer and mixed sand and rubber in the lower layer produces a resilient surface at lower cost and lower thickness than conventional methods such as described in U.S. Pat. No. 4,337,283 to Haas and U.S. Pat. No. 4,396,653 to Tomarin.[18]

More generally, the specification discusses migration of particles in prior art uniform infills:

> In contrast, conventional mixes of resilient particles generally have significantly larger particles then the available graded sand. As a result the lighter larger resilient particles migrate upwardly and the heavier smaller hard sand particles migrate downwardly under the combined influence of gravity, vibration, rainfall and downwardly percolating water. Segregation of differently sized particles leads to loss of optimum compaction and uneven traction in conventional mixed infill layers.[19]

Given the patentee's above criticism of uniformly installed infill as in the '283 patent, Fieldturf may not *now* construe the claim to encompass uniformly installed infill. In *SciMed Life*, the Court emphasized the patent specification's recitation of the disadvantages of the prior art in limiting the scope of the claim term "lumen" (a passageway in a catheter) to include only coaxial lumens and exclude side-by-side lumens. *SciMed Life*, 242 F.3d at 1340. Similarly, in *Tekmar*, the Federal Circuit severely limited the scope of the claim term "passage" due to the

---

[16] *Id.*, col. 1, lines 59-62 (emphasis added).
[17] Statements describing "the invention as a whole" are more likely to be found in the Disclosure or Summary of the Invention section. *See, C.R. Bard*, 388 F.3d at 864.
[18] *Id.*, col. 8, lines 10-15.
[19] *Id.*, col. 7, lines 11-19.

patentee's statements distinguishing the prior art. *Tekmar*, 115 F.3d at 1581-82. In *Alloc*, the Court limited the construction of the term "play" based upon the specification's repeated criticism of prior art floor systems without play. *Alloc*, 342 F.3d at 1369-70.

In *Digital Biometrics*, the Federal Circuit adopted a narrow construction of the term "slice data" in a fingerprint imaging system as synonymous with "active area" based upon the applicant's statements distinguishing the claimed invention from the prior art. 149 F.3d at 1347. The Court emphasized that "[t]he public has a right to rely on such definitive statements made during prosecution. Notice is an important function of the patent prosecution process. . ." *Id.*

Even absent such criticism, however, claims should be construed in a way that avoids ensnaring prior art. *See, e.g., Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153 (Fed. Cir. 1997) ("claims should be read in a way that avoids ensnaring prior art if it is possible to do so"); *Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) ("Any other construction of [the claim] would render it invalid.").

The Haas '283 patent, which issued 21 years before the '689 patent, teaches the use of a top-dressing layer or infill made up of a uniform mixture of resilient particles (such as shredded rubber tire stock) and fine sand.[20] The figure from the '283 patent is reproduced below:



---

[20] Berchou Aff. Ex. D, col. 3, lines 35-38.

The '283 patent teaches that the rubber and sand are installed as a uniform mixture throughout the depth of the infill.[21] The patent also teaches very broad ranges in the proportions of rubber and sand,[22] and also discloses broad ranges of infill particle sizes.

The discussion of such prior art in the specification makes clear that "the invention" only encompasses layers deliberately placed or installed, not layers created by the effects of particle migration. The patent itself expressly distinguishes the prior art based on the deliberate installation of distinct layers that are designed *not* to migrate, in contrast to the migration of prior art uniform infills into courses over time by the "dynamics of water, vibration and impact."[23] In fact, the specification states that "[i]t is an object of the present invention to provide an infill that will retain its properties throughout use *without* substantial segregation or compaction of the infill. . ."[24]

Thus, given the scope of the prior art, the term "disposed" in claim 1 should *not* now be construed to encompass or ensnare a prior art infill that, although installed with rubber particles and sand particles uniformly throughout the depth of the infill, migrates over time into courses.

### 3.  The Preamble

The preamble itself supports Sportexe's construction. It reinforces the fact that the claim is limited to an infill as put in place or installed. The proposed claim chart below shows the preamble language.

---

[21] *Id.*, col. 4, lines 28-33.
[22] *Id.*, lines 30-39.
[23] *Id.*, col. 2, lines 57-58.
[24] '689 patent, col. 4, lines 50-54.

| **Claim Terms** | **Fieldturf's Proposed Construction** | **Sportexe's Proposed Construction** |
|---|---|---|
| Claim 1: "A synthetic grass assembly **for installation** on a supporting substrate" | The preamble indicates that this is an apparatus claim. Specifically, the apparatus is a synthetic grass turf assembly. The "for installation" language merely indicates applicability or use of the claimed assembly, i.e., for use "on a supporting substrate," and does not otherwise limit the claim. | This preamble should be construed as a material limitation and to mean that the limitations of this claim only apply to a synthetic grass assembly at installation. |

Given the specification's clear instruction that "the invention" is for a system installed or put in place at the time of installation, the language of the preamble is necessary to give life, meaning and vitality to the claim and is therefore a limitation. *See, In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1347-48 (Fed. Cir. 2002).

> No litmus test defines when a preamble limits claim scope. *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Whether to treat a preamble as a limitation is a determination "resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim. *Id.* In general, a preamble limits the claimed invention if it recites essential structure or steps, or if it is "necessary to give life, meaning and vitality" to the claim.

*Cruciferous Sprout Litigation*, 301 F.3d at 1347 (citations omitted). If the specification makes a clear link between "the invention" and the preamble language, the preamble may operate as a claim limitation. *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999); *General Electric Co. v. Nintendo Co.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989).

The '689 specification makes clear that the preamble language "helps to define the claimed invention and is, therefore, a limitation." *Cruciferous Sprout Litigation*, 301 F.3d at

1347. Specifically, the specification limits "the invention" to an infill *installed* in multiple courses or layers. "In light of the specification, to read the claim indiscriminately to cover all types" of infill "would be divorced from reality." *General Electric*, 179 F.3d at 1362.

### 4. Prosecution History

In response to a rejection under 35 U.S.C. §102(b), the patentee amended claim 1 as initially presented to include a two course infill. The following shows the amendments to claim 1, with language added underlined and items removed in brackets:

> 1. (Amended) A synthetic grass assembly for installation on a supporting substrate, the assembly comprising:
>
>                  *    *    *
>
> an infill layer of particulate material disposed interstitially between the upstanding ribbons upon the upper surface of the backing and of a depth less than the length of the ribbons, the particulate material selected from the group consisting of [:] hard[;] and resilient granules; said infill layer further including
>       a bottom course of intermixed hard and resilient granules, disposed upon the upper surface of the backing, and
>       a top course substantially exclusively of resilient granules disposed upon the bottom course, an upper portion of the synthetic ribbons extending upwardly from a top surface of the top course wherein the synthetic ribbons:[25]

Thus, the limitations regarding an all resilient top course "disposed upon" a bottom course of hard and resilient granules were *added for reasons related to patentability* and were critical to the allowance of the patent.

Furthermore, the '689 patent is a continuation-in-part of an earlier filed international application and claims priority from Canadian Application No. 2,247,484.[26] Because they are related, the content of the Canadian application may be used to interpret the claims of the '689

---

[25] Berchou Aff. Ex. B, Tab 6, p. 11 [Amendment dated August 30, 2002].
[26] Berchou Aff. Ex. C. This application is included in the prosecution history of the '689 patent and is the international parent of the '527 patent.

patent. *See Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1044 (Fed. Cir. 2000) (common construction of limitations in the claims of two related patents is appropriate).

As in the '689 specification, the Canadian application expressly acknowledges that "[t]he prior art utilizes a uniform mixed infill of sand and rubber particles"[27] and that "[t]he significant difference between the method of the *invention* and prior art is the *depositing* of multiple separate courses each with different characteristics. *Of course, depositing multiple layers involves more skill and time than depositing a single thick layer, however, the advantages are significant and can be justified as explained above.* "[28]

Thus, the references to the depositing of multiple layers in the prosecution history confirm Sportexe's proposed construction of "disposed" as meaning "installed or put in place".

### 5. Sportexe's Proposed Construction is Supported by the Case Law

A claim term should be construed to cover an article at the time of sale, not an article changed over time as a result of ordinary use. *See, e.g., Novartis Pharmaceuticals Corp. v. Eon Labs Manufacturing, Inc.*, 363 F.3d 1306 (Fed. Cir. 2004)(holding that patent claim did not cover products formed in stomach after drug ingested, only product formed outside of body); *Stash, Inc. v. Palmgard Int'l, Inc.*, 937 F. Supp. 531 (D. Md. 1996)(rejecting patentee's argument that athletic gloves which did not infringe at time of sale infringed after product broke down though ordinary use).

> The patent relates to an article manufactured for sale in the patented form, and, normally, *the monopoly is to be judged by the situation at the time of sale*. If it is the first vendor's intention that the purchaser, before use, shall add something or subtract something whereby infringement will become manifest, the law antedates that change to the time of sale; *but the principle cannot reach a case where the infringing form is gradually developed by*

---

[27] *Id.*, p. 4.
[28] *Id.*, p. 9 (emphasis added).

> *ordinary use.  It would result, as applied to this subject-matter,*
> *that some lifts would come to infringe and some would not*; some
> would be worn down all alike and become horizontal planes,
> others would be worn off only on one edge, and others would go
> upon seldom-worn shoes and never change their shape.

*Elyria Nat'l Rubber Heel Co. v. I.T.S. Rubber Co.*, 263 F. 979, 981-82 (6th Cir. 1920) (emphasis

added); *see, also, Cadwell v. Firestone Tire & Rubber Co.*, 13 F.2d 483 (E.D.N.Y. 1926), *aff'd*

*per curiam*, 23 F.2d 1000 (2d Cir. 1928)(tires which became smooth through ordinary use not

infringing); *Omark Industries, Inc. v. Carlton Company*, 458 F. Supp. 449, 453 (D. Or. 1978),

*aff'd*, 652 F.2d 783 (9th Cir. 1980)(rejecting argument that article which as a result of wear

becomes identical with the patented article constitutes infringement).

Sportexe's proposed construction, which requires separate layers deposited at the time of

installation, is therefore consistent with not only the specification, but also the case law.  Under

Fieldturf's migration theory, certain uniform infill might migrate into layers through ordinary

use.  As in *I.T.S. Rubber*, some fields installed as a uniform mix might come to form layers and

some would not, depending upon factors such as weather (not an issue if an indoor stadium),

amount of use and particle characteristics.[29]  The case law makes clear that fields installed

uniformly, even if they age into layers, may not be construed to infringe.

      6.  <u>Inventor Testimony</u>

**REDACTED**

**REDACTED**

### 7. Dictionary Definition

One of the constructional aids available to the Court, especially to explore the ordinary meaning of a term, are dictionary definitions. *Phillips*, 415 F. 3d at 1318. The Merriam-Webster online dictionary defines the word "dispose" as "to put in place." Similarly, Webster's Third New International Dictionary of the English Language defines "dispose" as "to put in place or order," and the American Heritage Dictionary of the English Language, Fourth Edition, defines "dispose" as "to place or set in a particular order; arrange".

Thus, based on its dictionary definition, the ordinary meaning of the term "disposed" is to put in place.[31] This definition, together with the prosecution history and written specification, establish that "disposed" is synonymous with "installed" or "put in place."

### 8. Fieldturf's Proposed Construction is Not Enabled

In addition to providing notice to the public as to what will infringe and what will not, an applicant for a patent must provide in the specification "a written description of the invention and the manner and process of making and using it, in such full, clear, concise and exact terms so as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . " 35 U.S.C. § 112, first paragraph. Consequently, "if

---

[30] Berchou Aff. Ex. J, p. 147, lines 11-24 (FILED UNDER SEAL)(emphasis added).
[31] Fieldturf offers no dictionary definition, or any other support, for its proposed construction "located upon."

the claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement under § 112, ¶ 1, [the Federal Circuit] will adopt the narrower of the two." *Digital Biometrics,* 149 F.3d at 1344, citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1581 (Fed. Cir. 1996).

If the term "disposed" is interpreted as suggested by Fieldturf – to reach an infill installed as a uniform mixture of sand and rubber – the resulting claim would not be enabled as required by the patent statute. Nowhere does the specification explain how "games" might be played with the particles in a uniformly mixed infill to "controllably create" layers covered by the '689 patent.[32] As a result, this Court should "adopt the narrow claim construction that is clearly supported by the written description," as proposed by Sportexe.

### 9. Fieldturf's Attempt to Compartmentalize Product Claims and Process Claims Should Be Rejected

It is entirely permissible for a product (or apparatus) claim to include process elements or limitations. *See, Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 970 F.2d 834 (Fed. Cir. 1992). In fact, the construction proposed by Fieldturf for dependent claim 5 of this patent, and claim 7 of the '885 patent (discussed at Section VI.A.1 below), imports process elements and limitations. Claim 5, which is dependent from claim 1 at issue here, calls for "cryogenically ground rubber" and Fieldturf's very own proposed construction states: "Cryogenically ground rubber means rubber particles which have been made from the *process* of reducing rubber from used tires by a cryogenically ground rubber *method.*"

---

[32] Berchou Aff. Ex. E, p. 58.

- 24 -

Obviously, Fieldturf cannot oppose Sportexe's proposed claim construction on the basis that "disposed" cannot mean installed or put in place because it imports a process element, when Fieldturf itself adopts such a process importing construction in dependent claim 5.

    10. Conclusion

The intrinsic and extrinsic evidence conclusively supports construction of the term "disposed" to mean installed or put in place. The claim should be construed to exclude a field in which the infill is installed as a uniform mixture.

    **B.** **"Infill Layer"**

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 1: an "**infill layer**" | A layer of particulate material. | A continuous, distinct and uniform layer of particulate material extending across the entire surface of the backing. |

The construction of this term is believed to be unnecessary. Sportexe does not contest Fieldturf's proposed construction that "infill layer" means a "layer of particulate material."

    **C.** **"Course"**

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 1: "**a bottom course**" | A layer of intermixed hard and resilient granules. | A continuous, distinct, separate and uniform layer which is laid beneath the top course, extending across the entire length and width of the synthetic grass assembly. |
| Claim 1: "**top course**" | A layer predominantly made up of resilient granules. | A continuous, distinct, separate and uniform layer which is laid above the bottom course, extending across the entire length and width of the synthetic grass assembly. |

The parties do not dispute that the terms "course" and "layer" are used interchangeably in the specification.[33] A determination is required, however, as to the nature of such a layer.

The '689 patent Abstract defines the layers of the invention as "distinct" courses of particulate material:

> An infill layer of two *distinct* graded courses of particulate material is disposed interstitially between the upstanding ribbons upon the upper surface of the backing and of a depth less than the length of the ribbons.

Furthermore, in the European Patent Office ("EPO") proceedings regarding identical claim language in a related European patent, Fieldturf defined layer as follows: "[a] layer is understood to be a well-defined thickness of material which extends like a stratum across the whole playing area."[34] Thus, the specification and Fieldturf's own admissions support Sportexe's proposed construction of "course" to mean a continuous, distinct, separate and uniform layer.

In addition, as with the construction of the term "disposed," "course" cannot be construed to encompass a layer resulting from migration, as admitted by Fieldturf in the EPO proceeding:

> Moreover, if there could (not would) be intermingling at the interface between the sand layer 8 and rubber layer 7, the intermingling will not be uniform and will not form a stratum-like layer over the whole playing surface.[35]

**D.** **"Substantially Exclusively"**

The parties proposed constructions of this term are set forth below:

---

[33] Also, Webster's Third New International Dictionary defines "course" as a "row or layer". Merriam Webster Online Dictionary defines "course" as a "layer" and the American Heritage Dictionary of the English Language, Fourth Edition, defines "course" as a "continuous layer of building material..."
[34] Berchou Aff. Ex. G, p. 2.
[35] *Id.* Ex. H, p. 4.

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 1: "a top course **substantially exclusively of resilient granules**" | Predominantly made up of resilient granules. | A course of purely resilient granules such as rubber which remains substantially pure. |

It is clear from the specification that the existence of sand in the top rubber layer would affect the basic and supposedly novel characteristics of the claimed invention and, therefore, the claim should be construed to require purely resilient granules, such as rubber without any sand.

In several places, the specification instructs that "the invention" requires a pure rubber top layer without sand:

> *The invention* is directed to a synthetic grass with grass-like ribbons forming a lattice enmeshing a particulate infill having a bottom layer of equally sized sand and rubber granules, and a top layer of *rubber granules only.*[36]

> The *invention* maintains its resilience even when used in thin layers since *the top layer is of pure rubber* granules and the mixed lower course does not tend to separate or compact. Thus a more predictable long term resiliency is created.[37]

The specification explains that "with a pure rubber resilient top course 6, resilience is provided at the contact surface where the perception of resilience is actually needed."[38] As indicated, the references to "the invention" requiring pure rubber granules to provide resilience dictates that any amount of sand in the top rubber layer would defeat the indicated points of novelty and therefore cannot fall within the substantially exclusively language.

Fieldturf provides no analysis of the specification, and no basis whatsoever for the term being synonymous with "predominantly," nakedly asserting that even one not skilled in the art

---

[36] '689 patent, col. 1, lines 11-15 (emphasis added).
[37] *Id.,* col. 8, lines 17-21 (emphasis added).
[38] *Id.,* col. 11, lines 60-62 (emphasis added).

should know that "precision dimensional lamination of layers was not intended."[39] Fieldturf gives no indication at all as to what percentages of sand or other non-rubber particles in the top layer would still result in infringement. Without any meaningful alternative proposed by Fieldturf, and given the above statements in the specification, Sportexe proposes that the claim require a pure rubber top layer.

E.    **Dependent Claim 2**

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 2: "**resilient granules in the top course are larger than the resilient granules in the bottom course**". | The resilient granules in the top course are larger than the resilient granules in the bottom course. | This clause should be construed to mean that none of the resilient granules in the top course are smaller than the resilient granules in the bottom course and may not be construed to cover an infill in which any of the resilient granules in the bottom course are the same size or larger than the resilient granules in the top course. |

This claim should be construed to mean that none of the resilient granules in the top course are smaller than the resilient granules in the bottom course. To construe the claim in any other manner is to render it meaningless. That is, absent Sportexe's proposed construction, claim 2 would read on an infill which had some granules in the top course that were larger than some granules in the bottom course, and had some granules in the bottom course that were larger than some granules in the top course, which would seemingly cover *any* particle distribution. This would result in a claim that does not provide any limitation nor any notice to the public as to what would infringe and what would not infringe.

_____

[39] Fieldturf's Opening Claim Construction Brief, p. 10.

- 28 -

In addition, the claim does not use any language of approximation to modify the number of resilient granules that must vary in size between the courses. If the patentee had wanted to have the claim encompass courses in which there was some overlap in particle size, it would have been wonderfully easy for the patentee to draft the claim to cover that type of infill.

**F.    "Cryogenically Ground Rubber"**

As in Section VI.A.1 below, Sportexe does not contest Fieldturf's proposed construction that "cryogenically ground rubber" means "rubber particles which have been made from the process of reducing rubber from used tires by a cryogenically ground rubber method."

**G.    "Rows Spaced Apart"**

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 10: **"rows spaced apart"** | Ordinary and customary meaning. | The tufting gauge.<br><br>—This term may not be construed to cover the stitch rate. |

There does not appear to be a dispute at this time with respect to this claim term. Sportexe's proposed claim construction is intended to clarify that, to someone skilled in the art, "rows spaced apart" is synonymous with the "tufting gauge," and not the stitch rate.

**H.    Dependent Claim 14**

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 14: **"depth of the infill layer** ... between **90% to 40% of** the length of synthetic ribbons." | The depth of the infill layer is in the range between 90% to 40% of the length of the synthetic ribbons. | "Between 90% to 40% of the length of the synthetic ribbons" should mean not more than 90% and not less than 40% across the entire infill layer. |

As claim of 14 does not use any terms of approximation such as "about" or "approximately," the range between 90% to 40% should be construed to cover only the exact percentages provided, without any leeway above or below the specified range.

## I.    Dependent Claim 18

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 18: "**fibrillated into individual strands** of a width in the range between **1.0 to 15.0 mm**" | The individual strands of the upper portion of the synthetic ribbons have widths in the range between 1.0 to 15.0 mm. | These terms should be construed in accordance with their ordinary and customary meaning. |

There does not appear to be a dispute with respect to the terms in claim 18.

## V.    CONSTRUCTION OF THE '527 PATENT

Many of the claim terms discussed above in connection with the '689 patent are also disputed as used in the '527 patent. The additional evidence identified below in the context of the '527 patent should be considered as further support for Sportexe's proposed construction of the same terms in the '689 patent (and vice versa), as the two patents share the same parent application. *See, Jonsson*, 903 F.2d at 818; *Southwall*, 54 F.3d at 1579.

As illustrated in Figure 2 below, the '527 patent discloses a turf system having upstanding synthetic ribbons extending from a backing (1). Installed amongst the ribbons is an infill layer (3) of particulate matter made up of three sub-layers or "courses": a base course (4), a middle course (5) and a top course (6).



## FIG.2

As shown below, claim 1 of the '527 patent, the only independent claim, calls for a

synthetic turf system having a rubber and sand infill comprising three distinct layers:

> **1.** A synthetic grass turf assembly **for installation** on a supporting substrate to provide a game playing surface, the turf assembly comprising:
>
> a pile fabric with a flexible sheet backing and a plurality of upstanding synthetic ribbons of a selected length, representing grass blades, extending upwardly from an upper surface of the backing; and
>
> an infill layer of particulate material **disposed interstitially** between the upstanding ribbons **upon** the upper surface of the backing and of a depth less than the length of the ribbons, the particulate material selected from the group consisting of: hard and resilient granules, the infill layer including:
>
> a **base course substantially exclusively of hard granules disposed upon** the top surface of the backing;
>
> a **middle course** of intermixed hard and resilient granules of a **selected relative weight ratio, disposed upon** the base course; and
>
> a **top course substantially exclusively of resilient granules disposed upon** the middle course, an upper portion of the synthetic ribbons extending upwardly from a top surface of the top course.

### A.    "Disposed"

As in the '689 patent, "disposed" is repeated in several places in claim 1 of the '527

patent, as shown in the following claim chart.

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 1: "infill layer of particulate material **disposed** interstitially between the upstanding ribbons and **upon** the upper surface of the backing" | Located between the upstanding ribbons and upon the upper surface of the backing. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses. |
| Claim 1: "base course . . . **disposed upon** the top surface of the backing" | Located upon the top surface of the backing. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses. |
| Claim 1: "middle course . . . **disposed upon** the base course" | Located upon the base course. | "Disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses. |
| Claim 1: "top course . . . **disposed upon** the middle course" | Located upon the middle course. | The term "disposed" should be construed to mean installed or put in place.<br><br>—This term may not be construed to cover an infill installed as a uniform mixture which migrates after installation into courses. |

Consistent with the '689 patent, Sportexe submits that the term "disposed" should be

construed to mean installed or put in place.  This construction accords with not only with the

- 32 -

scope of the prior art but with the definition implied in the specification, the dictionary definition and relevant case law.

### 1. The Specification

The specification does not explicitly define "disposed." However, the specification emphasizes that the invention claimed in the '527 patent requires the "depositing of multiple separate courses":

> ***The significant difference between the method of <u>the invention</u> and prior art is the <u>depositing of multiple separate courses</u> each with different characteristics. Of course, depositing multiple layers involves more skill and time than depositing a single thick layer, however, the advantages are significant and can be justified as explained above.***[40]

It is this more difficult and time-consuming installation which distinguishes the claimed *invention* (not just a preferred embodiment) from the prior art. The patent Abstract confirms this:

> A base course is first *placed upon* the top surface of the backing and consists exclusively of hard sand granules. A middle course of intermixed hard sand and resilient rubber granules with a relative weight ratio of 3 to 1 is then *placed upon* the base course. A top course exclusively of resilient rubber granules is then *placed upon* the middle course.[41]

> Similarly, the Disclosure of the Invention section states:

> A middle course of intermixed hard sand and resilient rubber granules with selected weight ratio of 3 to 1 for example, is *then placed upon* the base course. A top course exclusively of resilient rubber granules is *finally placed upon* the middle course. The rubber granules are of size between 10 and 30 mesh.[42]

---

[40] '527 patent, col. 5, lines 62-67 (emphasis added); *see, also,* Berchou Aff. Ex. C, p. 9 (Prevost Canadian Patent Application No. 2,247,484 ("Of course, depositing multiple layers involves more skill and time than depositing a single thick layer, however, the advantages are significant...").

[41] '527 patent, Abstract (emphasis added).

[42] *Id.*, col. 3, line 66 – col. 4, line 4 (emphasis added).

The Preferred Embodiments section discloses a single manner of making the claimed invention. Consistent with the foregoing, this section stresses that it is "necessary" to "deposit multiple distinct layers" in the manner provided:

> In order to deposit multiple distinct layers, it is *necessary* to pass over the same area several times with a substantially pure sand spreading operation then proceeding over the same area again with a mixed sand and rubber material. *Thereafter*, it is *necessary* to pass over the area again and distribute the substantially pure rubber material.[43]

> After spreading each course, it is *necessary* to brush the surface and raise the ribbons to an upstanding position as shown in the drawings.[44]

As a result, "disposed" in this claim should be construed in the same manner as in claim 1 of the '689 patent: "installed or put in place."

### 2. Prior Art Distinguished and Criticized in the Specification

As in the '689 patent, the '527 specification repeatedly criticizes prior art having a uniform mix of sand and rubber:

> A number of disadvantages result from the use of a uniformly mixed granular infill as in prior art systems where hard sand particles and resilient rubber particles are mixed in a uniform manner throughout the depth of the infill.[45]

> Prior art infill systems fail to recognize that the infill is a dynamic system continuously in movement under the influence of bouncing balls, vibration and impact from the feet and bodies of players in contact with the top surface of the infill.[46]

> The prior art utilizes a uniformly mixed infill of sand and rubber particles. It has heretofore not been recognized that the infill acts

---

[43] *Id*, col. 5, lines 49-54.
[44] *Id*, col. 5, lines 59-61.
[45] *Id.*, col. 1, lines 59-62.
[46] *Id.*, col. 2, lines 10-14.

as a dynamic system when exposed to impact and vibration of athletic play on the top surface.[47]

The combined multiple courses produce a resilient surface at lower cost and lesser thickness than methods. In contrast, uniformly mixed infill layers tend to consolidate into a firm compacted surface, and can be highly resilient and costly if applied in a thick layer. The invention maintains its resilience even when used in thin layers since the top layer is a pure rubber granules and the multiple courses do not tend to separate or compact.[48]

For the reasons expressed in Section IV.A.2. above, the term "disposed" in claim 1 of the '527 patent should be construed to *exclude* a prior art infill that, although installed uniformly throughout the depth of the infill, migrates over time into courses.

### 3. Sportexe's Proposed Construction is Supported by the Preamble, the Case Law and the Dictionary Definition

For the reasons expressed in Section IV above in connection with the '689 patent, Sportexe's proposed construction is supported by the preamble, the case law and the dictionary definition.

### 4. Fieldturf's Proposed Construction is Not Enabled

For the reasons set forth in Section IV above in connection with the '689 patent, a construction broader than that proposed by Sportexe would not be enabled as required by the patent statute.

### B. "Infill Layer"; "Course; "Substantially Exclusively"

For the reasons set forth above in connection with the '689 patent, the Court should adopt Sportexe's proposed construction for the terms "infill layer," "course" and "substantially exclusively."

---

[47] *Id.*, col. 3, lines 5-8.
[48] *Id.*, col. 4, lines 37-44.

### C.    "Installed Unit Weight"

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 8: "**installed unit weight**" | This clause should be construed in accordance with its ordinary and customary meaning. | This clause should be construed in accordance with its ordinary and customary meaning, at installation. |

The parties are in agreement with respect to this claim term. Remarkably, Fieldturf describes Sportexe's proposed construction as "far-fetched" then, in the next paragraph, agrees with it:

> This claim simply requires all of the limitations of claim 1, and, the limitation that the unit weight of the top course *when installed* is at a maximum 0.6 pounds per square foot of the top surface area.[49]

Sportexe's proposed construction should, therefore, be adopted.

## VI.   CONSTRUCTION OF THE '885 PATENT

The '885 patent discloses a turf system with upstanding synthetic ribbons extending from a two-layer backing,[50] and an infill layer of particulate material disposed between the ribbons. The infill has a mixture of silica sand and cryogenically ground rubber particles,[51] with the cryogenic rubber particles described as follows:

> Cryogenically ground rubber means rubber particles which have been made from the process of reducing rubber from used tires by a cryogenically ground rubber method. *The fragmenting of the rubber when it is frozen results in rubber particles with <u>smoother</u> surfaces less jagged as would occur with non-cryogenically ground rubber.*[52]

---

[49] Fieldturf's Opening Claim Construction Brief, p. 13.
[50] '885 patent, col. 5, lines 39-53.
[51] *Id.*, col. 7, lines 44-46.
[52] *Id.*, col. 4, lines 40-45.

A.      **Independent Claim 7 and Its Dependent Claim 9**

      1.  Claim 7

Claim 7 of the '885 patent requires infill with a mixture of cryogenically ground rubber and sand:

> **7.** A synthetic surface having a flexible, backing member and parallel rows of synthetic ribbons, representing blades of grass, projecting upwardly from the backing member, the surface including a relatively thick layer of particulate material on the backing member supporting the ribbons in a relatively upright position relative to the backing member, the particulate material comprising a mixture of **cryogenically ground rubber** and sand.

The specification for the '885 patent refers to a cryogenic process wherein "frozen" rubber is "fragmented."[53] While the definition of "cryogenically ground rubber" proposed by Fieldturf is circular, a more specific definition is not presently an issue as there is no allegation that Sportexe's use of ambiently ground rubber falls within the scope of this claim. Accordingly, Sportexe does not contest Fieldturf's proposed construction that cryogenically ground rubber means "rubber particles which have been made from the process of reducing rubber from used tires by a cryogenically ground rubber method."

      2.  Claim 9

Claim 9, which is dependent from claim 7, states as follows:

> **9.** A synthetic surface as defined in claim 7, wherein the ground rubber is in the form of particles having a **relatively smooth** surface."

This claim begs the question: "relative to what?" As set forth in the following claim chart, Sportexe submits that "relatively smooth" should be interpreted relative to "cryogenically

---

[53] *Id.*

ground rubber", the term used in the independent claim to which claim 9 refers. Fieldturf

improperly contends that "relatively smooth" relates to prior art ambient rubber.[54]

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 9: "particles having a **relatively smooth surface**" | Particles that have a smooth surface, but not completely or absolutely smooth.<br><br>". . . not completely smooth, but is smoother than the prior art resilient granules." (Fieldturf Opening Claim Construction Brief, p. 23). | A surface smoother than the surface of "cryogenically ground rubber."<br><br>—This term may not be construed to cover ambiently ground rubber particles. |

Under principles of claim differentiation, claim 7 and claim 9 may not be construed to be

identical in scope. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325

(Fed. Cir. 2001). In addition, *dependent* claim 9 cannot be construed as broader in scope than

*independent* claim 7. *See,* 35 U.S.C. 112; *In re Fine*, 837 F.2d 1371, 1376 (Fed. Cir. 1988).

Since claim 9 depends from claim 7, the particles referenced in claim 9 must be a subset

of the cryogenically ground rubber of claim 7.[55] Consequently, Fieldturf's proposed

construction would improperly render claim 9 broader in scope than claim 7, in that such a

construction would encompass more than cryogenically ground rubber, which is the boundary of

claim 7.

As a result, Sportexe requests that "relatively smooth surface" be interpreted to mean a

surface smoother than the surface of cryogenically ground rubber. This interpretation is

---

[54] Fieldturf Opening Claim Construction Brief, p. 23.

[55] Fieldturf apparently agrees with this conclusion, stating that the claim term should "be given its ordinary and customary meaning *relative to the definitions of the claim from which it depends.*" (Fieldturf's Opening Claim Construction Brief, p. 23). However, Fieldturf then ignores the claim from which it depends (claim 7) in illogically concluding that the term relates to something other than cryogenically ground rubber, namely prior art ambient rubber.

- 38 -

consistent with all of the claim language and results in a dependent claim narrower in scope than

independent claim 7, as required by the Patent Act.

### B. Independent Claim 10

Claim 10 of the '885 patent calls for a synthetic surface having a relatively thick layer of

particulate matter with a mixture of "smooth" resilient particles and hard particles:

> **10.** A synthetic surface having a flexible, backing
> member and parallel rows of synthetic ribbons,
> representing blades of grass, projecting upwardly from
> the backing member, the surface including a relatively
> thick layer of particulate material on the backing
> member supporting the ribbons in a relatively upright
> position relative to the backing member, the particulate
> material comprising a mixture of particulate material
> having **smooth resilient, particles** and hard particles
> wherein the hard and resilient particles are in a range of
> between 4 to 70 mesh.

The parties have proposed the following constructions:

| Claim Terms | Fieldturf's Proposed Construction | Sportexe's Proposed Construction |
|---|---|---|
| Claim 10: "**smooth,** resilient particles" | Resilient particles that have smooth surfaces. | Resilient particles all of which have an outer surface that is smoother than ambiently ground rubber particles.<br><br>—This term may not be construed to cover ambiently ground rubber particles. |

The term "smooth" is not explicitly defined in the '885 patent and is a relative and

ambiguous term. As discussed below, Sportexe requests that the term be limited so as to exclude

ambient, or non-cryogenically ground, rubber and be defined as "smoother than ambiently

ground particles".

- 39 -

1. The Specification

As set forth above, the specification describes cryogenic rubber particles as follows:

> Cryogenically ground rubber means rubber particles which have
> been made from the process of reducing rubber from used tires by
> a cryogenically ground rubber method. *The fragmenting of the
> rubber when it is frozen results in rubber particles with smoother
> surfaces less jagged as would occur with non-cryogenically
> ground rubber.*[56]

This is the only time the word "smooth" appears in the specification apart from claim 10 itself.

The specification asserts that the benefit of using cryogenically ground rubber, as opposed to

non-cryogenically ground (*i.e.*, ambient) rubber, is that the cryogenically ground particles

> are rounder, minimizing abrasion and also lessening compaction. The less
> angular rubber particles also wet easier thereby aiding drainage. Further,
> the particles are also less likely to float away if the surface is flooded since
> microscopic air bubbles are not as readily adhered to the rounded
> particles.[57]

Thus, the specification makes clear that the reference to smooth particles in claim 10 *does not*

*encompass non-cryogenically ground rubber.*

The Federal Circuit addressed a similar claim construction issue in *Tekmar*. There, the

Federal Circuit construed the term "passage" and held that, based on statements in the

specification, the term "passage" did *not* encompass a smooth-walled structure. *Tekmar,* 115

F.3d at 1580. The Court based its construction on a portion of the written specification that

distinguished the inventive "passage" from the prior art:

> A number of different geometries for the second section are
> contemplated, including those having irregular shaped surface or
> noncylindrical shape. *In contrast, the prior art has generally
> specified that the pneumatic tubing and passageways between the
> trap and GC are smooth-walled.*

---

[56] '885 patent, col. 4, lines 40-45.

[57] *Id.*, col. 7, lines 46-52; *see, also,* col. 3, lines 52-58.

*Tekmar*, 115 F.3d at 1581 (emphasis in original). The Federal Circuit concluded:

> All of the "passage" structures contemplated by the written
> description are thus either non-smooth or conical. In addition, the
> description expressly distinguishes over prior art passages by
> stating that those passages are generally smooth-walled. OI has
> not identified anything in the prosecution history contrary to those
> statements. Therefore, we conclude that one skilled in the art
> reading the claims, description, and prosecution history would
> conclude that the term "passage" in claim 17 does not encompass a
> smooth-walled, completely cylindrical structure.

*Tekmar*, 115 F.3d at 1581.

As in *Tekmar*, the written specification for the '885 patent expressly distinguishes the

non-cryogenically ground rubber known in the prior art from the "smoother" particles claimed.

Therefore, as in *Tekmar*, this Court should find that one skilled in the art, reading the claims in

light of the specification, would conclude that the term "smooth" in claim 10 does not

encompass non-cryogenically ground rubber.

### 2. Prosecution History

During prosecution of the '885 patent, the patentee made a number of arguments that

limit the definition of the term "smooth" as proposed by Sportexe, distinguishing his infill from

an infill disclosed in the prior art '283 patent. As mentioned above, Haas '283 teaches a playing

surface with a mixture of resilient particles and sand.[58] It also teaches that the resilient particles

in the infill can be rubber particles formed from shredded rubber tire stock.[59]

Claim 10 as originally submitted[60] was rejected during prosecution. The patentee

amended the claim by inserting a further limitation that the infill "comprises a mixture of

---

[58] Haas '283 patent, col. 3, lines 35-38.

[59] *Id.*, col. 4, lines 45-46 and col. 5, lines 8-11.

[60] Issued claim 10 was prosecuted as claim 41.

particulate material *having a relatively smooth surface* and hard particulate material." [61]  After

rejection of the amended claim based on the Haas '283 patent and U.S. Patent No. 3,940,522, the

patentee distinguished the type of rubber particles disclosed in the prior art:

> As discussed in Applicant's specification (last paragraph on
> page 6), *the smooth particles of the present invention are less*
> *angular than particles such as non-cryogenically ground crumb*
> *rubber* and has [sic] less tendency to allow water and microscopic
> air bubbles carried by the water to attach to them.[62]

This statement, made during prosecution to distinguish for the prior art and relied on by

the Examiner to allow the claim to issue, clearly limits the patentee from arguing that "smooth"

can now be construed to encompass non-cryogenically ground rubber.  The implications of this

statement may be better understood by considering the converse, which is:

> *Particles such as non-cryogenically ground rubber are more*
> *angular than the smooth particles of the present invention.*

Thus, if one uses non-cryogenically ground rubber (*i.e.* "ambient rubber"), as Sportexe does,

such rubber by the patentee's own definition is not "smooth," since it is "more angular" than the

"smooth" particles defined in claim 10.

After repeating the advantages of smooth particles, the patentee also stated:

> Applicant submits that the unexpected results of superior drainage
> and resistance to "floating away" are unique aspects of the present
> invention that were/have not been appreciated by the prior art of
> record.  *When compared to typical performances from crumb*
> *rubber that has relatively, rough surfaces, the smooth, resilient*
> *particles of the present invention produce the unexpected results of*
> *superior drainage and resistance to floating away that were*
> *previously not realized in the prior art systems.*[63]

---

[61] Berchou Aff. Ex. A, Tab 16, p. 4 [Response mailed September 25, 2000].

[62] *Id.*, Tab 21, p. 10 [Response mailed June 21, 2001].

[63] *Id.* at p. 12.

Because the patentee made these statements in the context of an amendment limiting the resilient

particles to "smooth" particles, this claim must be construed as limited to resilient particles of a

smoothness greater than non-cryogenically ground rubber. Claim 10 does *not* cover rubber

particles that have been ground by non-cryogenic or ambient methods.

 This construction is consistent not only with the specification and prosecution history,

but also with the dictates of the Federal Circuit in *Hockerson-Halberstadt Inc. v. Avia Group*

*International Inc.*, 222 F.3d 951 (Fed. Cir. 2000). In that case, the Federal Circuit construed the

term "groove":

> Review of the prosecution history, however, reveals that the
> inventor disclaimed a particular interpretation of groove, thereby
> modifying the term's original meaning . . . The inventor then
> distinguished the prior art by arguing that the claimed invention
> "*provide[es] a much narrower groove* for a totally different
> purpose, namely . . . to involve *as much of the underneath surface*
> of the footwear *as possible* in a cushioning and supporting
> function." Flowing from this statement is the inventor's clear
> disavowal of footwear having a groove width greater than that
> disclosed in the prior art.

222 F.3d at 956 (emphasis in original). The Court in *Hockerson-Halberstadt* identified the

fundamental importance of this rule of construction:

> HHI's argument therefore reduces to a request for a mulligan that
> would erase from the prosecution history the inventor's disavowal
> of a particular aspect of a claim term's meaning. Such an
> argument is inimical to the public notice function provided by the
> prosecution history. *The prosecution history constitutes a public*
> *record of the patentee's representations concerning the scope and*
> *meaning of the claims, and competitors are entitled to rely on*
> *those representations when ascertaining the degree of lawful*
> *conduct, such as designing around the claimed invention. In the*
> *present case, the inventor's statements about groove width are*
> *part of the prosecution history and form the totality of the public*
> *record upon which competitors rely.*

*Id.* at 957 (emphasis added) (citations omitted). *See also CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed. Cir. 1997) (observing that statements made during prosecution commit the inventor to a particular meaning of a claim term that is binding during litigation); *Southwall*, 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

      3. <u>Inventor Testimony</u>

<br/>

**REDACTED**

**REDACTED**

4. Conclusion

Fieldturf's statement that it is "difficult to imagine" that this term could even be disputed

is remarkable in light of the intrinsic and extrinsic evidence wholly ignored by Fieldturf,

including the inventor's own inability to provide any concrete definition for this term. Fieldturf

---

[65] *Id.*, p. 40, lines 5-20.
[66] *Id.*, p. 42, lines 13-25 – p. 43, lines 1-15.

simply disregards the judicially imposed elements of claim construction in favor of its own circular definition: "smooth is smooth".[67] As demonstrated above, however, the intrinsic and extrinsic evidence conclusively supports construction of the term "smooth" to exclude non-cryogenically ground rubber.

## VII. **CONCLUSION**

For the foregoing reasons, Sportexe's proposed claim construction should be adopted in its entirety.

Dated: Buffalo, New York
      September 15, 2005

                       Respectfully submitted,

                       TRIEXE MANAGEMENT GROUP INC.,
                       SPORTEXE CONSTRUCTION SERVICES, INC.
                       SPORTEXE INTERNATIONAL, INC.
                       and SPORTEXE, INC.

                       By: _____ s/ Michael J. Berchou _____
                               One of Their Attorneys

Michael J. Berchou, Esq.
Rowland Richards, Esq.
PHILLIPS LYTLE LLP
3400 HSBC Center
Buffalo, New York 14203
Telephone: (716) 847-8400

William F. Dolan, Esq.
Brooke Weinstein, esq.
BELL, BOYD & LLOYD LLC
Three First National Plaza
70 West Madison Street, Suite 3300
Chicago, Illinois 60602-4207
Tel: (312) 372-1121

BFLO Doc. # 1370563.10

---

[67] Fieldturf's Opening Claim Construction Brief, p. 24